O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EDUARD SAFARYAN,

      Petitioner,

v.

TODD BLANCHE, et al.,

      Respondents.

Case No. 5:26-cv-03445-KES

ORDER GRANTING THE PETITION AND ORDERING PETITIONER'S RELEASE FROM CUSTODY

## I.   INTRODUCTION

Eduard Safaryan ("Petitioner") filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 ("Petition" at Dkt. 1), challenging his detention by the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE").  The parties have consented to the jurisdiction of the Magistrate Judge.  (Dkt. 11.)  The Petition is granted and Respondents are directed to immediately release him from custody.

## II.   PROCEDURAL HISTORY

Petitioner filed the present Petition on June 23, 2026.  (Dkt. 1.)  The Petition raises the following claims:

1

Ground 1: "Detention without a Statutory Basis": "There is no statutory basis to detain Petitioner," because the 90-day removal period in 8 U.S.C. § 1231(a) has ended, meaning he "is required to be released from detention under supervision" under 8 U.S.C. § 1231(a)(3).  (Pet. at 6-7 ¶¶ 18-22.)

Ground 2: "Due Process Violation – Inadequate Medical Care": Respondents have violated Petitioner's Fifth Amendment substantive Due Process Rights by failing to provide him with adequate medical care, i.e., his high blood pressure medication.  This caused him to be hospitalized, and he "continues to be at risk of suffering additional injuries if he remains detained."  (Pet. at 7-8 ¶¶ 23-27.)

The Petition seeks the following relief: (a) "order Respondents to immediately release Petitioner on an OSUP"; (b) "order Respondents to return any confiscated property to him, including, but not limited to, any photo identification and/or employment authorization card"; and (c) "enjoin Respondents from revoking Petitioner's release without providing him a determination by an impartial adjudicator that his detention is justified based on danger or flight risk, which cannot be sufficiently addressed by alternative conditions of release and/or supervision, at which hearing Respondents will bear the burden of proof of demonstrating that Petitioner is a flight risk or a danger to the community."  (Pet. at 10.)

The Petition attaches a number of exhibits (Dkt. 1-1), a proposed order (Dkt. 1-2), and a declaration from Petitioner's counsel, Sabrina Damas, authenticating the exhibits and swearing to the truth of the facts alleged in the Petition (Dkt. 1-3).

Respondents answered the Petition on June 30, 2026.  ("Answer" at Dkt. 9.) The Answer does not attach any supporting evidence or dispute any of the Petition's factual allegations.

Petitioner replied on June 30, 2026 ("Reply" at Dkt. 12) and also filed a notice of errata (Dkt. 13).

2

## III.    FACTUAL RECORD

### A.    Entry into the U.S. and Initiation of Removal Proceedings (1999-2000).

Petitioner is a citizen of Armenia.  (Pet. at 2 ¶ 2.)  He arrived in the U.S. on a tourist visa on July 14, 1999.  (Pet. at 2 ¶ 2.)  On November 22, 2000, he was served with a notice to appear ("NTA") charging him with removability for overstaying his tourist visa.  (Pet. at 2 ¶ 2; Pet. Ex. A / Dkt. 1-1 at 1-3.)

Petitioner submitted an affirmative application for asylum.  (Pet. at 2 ¶ 2.) While in removal proceedings, he also applied for adjustment of status based on his marriage to a U.S. citizen on December 26, 2000.  (Pet. at 2 ¶ 3; Pet. Ex. B / Dkt. 1-1 at 7 (marriage certificate).)

Petitioner and his wife had at least two children born in the U.S. in 2001 and 2002.  (Pet. Ex. B / Dkt. 1-1 at 5-6 (birth certificates).)  Petitioner's parents and his sisters also live in the U.S. and are U.S. citizens.  (Pet. at 2 ¶ 3; Pet. Ex. B / Dkt. 1-1 at 8-11 (relatives' citizenship documents).)  Petitioner has worked in the U.S. as a handyman for many years.  (Pet. Ex. E / Dkt. 1-1 at 59-63 (letters of support from coworkers/clients).)

### B.    Conviction for Assault with a Deadly Weapon (2006).[1]

In 2006, while his removal proceedings were pending before the Immigration Judge ("IJ") , Petitioner was charged with assault with a deadly weapon under California Penal Code § 245(a)(1).  (Pet. Ex. C / Dkt. 1-1 at 15-21 (documents from L.A. Superior Court case no. LA050594).)  The charge arose out

---

[1] During Petitioner's removal proceedings, Petitioner was also convicted of several other crimes in state court.  In 2001, he pled nolo contendere to trespass under California Penal Code § 602(j) and was placed on probation for 2 years. (Pet. Ex. C / Dkt. 1-1 at 52-54 (documents from L.A. Superior Court case no. 0PA04556).)  In 2009, he pled guilty to possession of a firearm and ammunition under California Penal Code §§ 12021(c)(1), 12316(b), and was placed on probation for 3 years.  (Pet. at 3 n.1; Pet. Ex. C / Dkt. 1-1 at 23-38 (documents from L.A. Superior Court case nos. LA062515 and LA062640).)

3

of a road rage incident, and the deadly weapon at issue was Petitioner's car. Safaryan v. Barr, 975 F.3d 976, 980 (9th Cir. 2020).[2] "On February 9, 2006, pursuant to a plea agreement, [Petitioner] pleaded no contest to … assault with a deadly weapon other than a firearm.  [Petitioner] was sentenced to three years of probation, with the requirement that he spend the first 270 days in jail.  [Petitioner] ended up serving only five days in jail."  Id.  Petitioner states that he is "pursuing a motion to vacate this conviction."  (Pet. at 3 n.1.)

### C.  First Ninth Circuit Appeal (2007-2010).

Petitioner states that his adjustment application was initially denied "due to an issue with the affidavit of support, and his case went to the Ninth Circuit before being remanded back to the [IJ]."  (Pet. at 2 ¶ 4.)  Online public records show that Petitioner had a case pending in the Ninth Circuit between March 2007 and October 2010, when the Ninth Circuit granted the government's motion to remand the matter to the Board of Immigration Appeals ("BIA").  See Safaryan v. Holder,

---

[2] In an appeal related to his immigration case (discussed further below), the Ninth Circuit described the facts of this incident as follows:

> [Petitioner] was arrested on October 30, 2005 in connection with an apparent road-rage incident.  According to the police report, another vehicle inadvertently cut off [Petitioner's] car as both were transitioning from the westbound 101 freeway to the northbound 405 freeway in the Sherman Oaks section of Los Angeles.  After following the other vehicle for a few miles, [Petitioner] allegedly swerved his car towards it several times and then intentionally struck the vehicle, which consequently collided into the center divider that separates the freeway's northbound and southbound traffic.  After [Petitioner] exited the freeway, he or his wife (who was with him and their children in the car) called the police and claimed that she had been driving the car and that she had been the victim of a hit-and-run.  After likewise initially insisting that his wife had been the driver, [Petitioner] soon thereafter admitted that he had been at the wheel when the collision occurred, but he insisted that the other vehicle had recklessly hit him.

Safaryan, 975 F.3d at 980.

No. 07-71208 (9th Cir.).[3]

### D.    Removal Order, BIA Appeal, and Second Ninth Circuit Appeal (2015-2020).

As noted above, the NTA initiated Petitioner's removal proceedings and charged him with removability for overstaying his tourist visa.  (Pet. at 2 ¶ 2; Pet. Ex. A / Dkt. 1-1 at 1-3.)  However, following his conviction for assault with a deadly weapon, "the Government argued that [his] intervening conviction under § 245(a)(1) constituted a 'crime involving moral turpitude,' which now rendered him 'inadmissible' under INA § 212(a)(2)(A)(i)(I), 8 U.S.C. § 1182(a)(2)(A)(i)(I), and therefore ineligible for adjustment of status in the absence of a waiver."  Safaryan, 975 F.3d at 980 (citing 8 U.S.C. §§ 1182(h), 1255(a)).  "The IJ agreed with the Government's position and also declined to grant a waiver, concluding that Safaryan had failed to show the requisite exceptional and extremely unusual hardship to him or his qualifying relatives.  Accordingly, the IJ ordered Safaryan removed to Armenia."  Id.  The IJ's removal order was entered on September 9, 2015.  See Executive Office for Immigration Review ("EOIR"), Automated Case Information, https://acis.eoir.justice.gov/en/ (A# 075-726-744, Armenia, last accessed July 7, 2026).

Petitioner appealed to the BIA, and the appeal was dismissed on December 5, 2016.  See EOIR, Automated Case Information, https://acis.eoir.justice.gov/en/ (A# 075-726-744, Armenia, last accessed July 7, 2026); see also Safaryan, 975 F.3d at 980-81.[4]

On December 30, 2016, Petitioner filed a petition for review in the Ninth

---

[3] The filings themselves are not publicly available on the PACER website.

[4] Respondents' Answer states that "Petitioner's Final Removal Order became administratively final on November 9, 2020, and Petitioner never filed a BIA appeal."  (Answer at 3.)  This is contradicted by the public records cited in this Order.

Circuit.  Safaryan v. Barr, No. 16-74039 (9th Cir.), Dkt. 1.  His removal was stayed while the case was pending.  Id., Dkt. 9.  On September 17, 2020, the Ninth Circuit denied his petition for review.  Safaryan, 975 F.3d at 979.  The Ninth Circuit agreed with the BIA's holding that Petitioner's conviction for assault with a deadly weapon under California Penal Code § 245(a)(1) was a crime involving moral turpitude, which made Petitioner ineligible for adjustment of status.  Id.  On November 9, 2020, the Ninth Circuit issued its mandate, dissolving the stay of removal.  Safaryan, No. 16-74039, Dkt. 40.

**E.     Status After Removal Order Became Final (November 2020-June 2026).**

There is no evidence that ICE detained Petitioner or took any action to remove Petitioner to Armenia for the next 5 years.  According to Petitioner, he was never detained during the 90-day removal period, and he was never placed on an Order of Supervision ("OSUP").  (Pet. at 7 ¶ 21.)[5]

In 2021, Petitioner suffered another criminal conviction.  He pled nolo contendere to trespass under California Penal Code § 602(k) and was placed on probation.  (Pet. Ex. C / Dkt. 1-1 at 46-48 (documents from L.A. Superior Court case no. 0VW02452).)  There is no evidence that ICE detained Petitioner based on that conviction.

**F.     Current Detention by ICE (June 2026).**

On June 9, 2026, nearly 6 years after his removal order became final, Petitioner was detained outside his home.  (Pet. at 3 ¶ 6.)

When Petitioner was detained, his wife notified the ICE officers that Petitioner had to take a prescription medication daily for high blood pressure and

---

[5] Although another part of the Petition states that Petitioner is "challenging the unlawful revocation of his release on an [OSUP]" (Pet. at 2 ¶ 1), Petitioner's later notice of errata clarifies that he has never been released on an OSUP (Dkt. 13).  Respondents' Answer does not dispute this.

provided the medication to the ICE officers.  (Pet. at 3 ¶¶ 5-6; Pet. Ex. D / Dkt. 1-1 at 56-58 (pictures of the prescription and bottle).)  Less than a week after his arrest, on June 13, 2026, Petitioner was taken to a local hospital for high blood pressure and remained there for 3 days.  (Pet. at 3 ¶ 7.)  He remains in ICE custody in Adelanto, California.  See ICE Detainee Locator, https://locator.ice.gov/odls/ (A# 075-726-744, Armenia, last accessed July 7, 2026).  According to the Petition, "His blood pressure remains high, around 155 to 160 over 95 to 105."  (Pet. at 3 ¶ 7.)

## IV.   DISCUSSION

### A.      Ground 1: Detention Without A Statutory Basis.

#### 1.      Statutory Framework.[6]

##### a.      Detention During the Removal Period.

Section 1231(a)(1)(A) provides, "[W]hen [a noncitizen] is ordered removed, the Attorney General shall remove the [noncitizen] from the United States within a period of 90 days (in this section referred to as the 'removal period')."  8 U.S.C. § 1231(a)(1)(A).  Detention is mandatory during this removal period.  8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General *shall detain* the [noncitizen].") (emphasis added); see also Khotesouvan v. Morones, 386 F.3d 1298, 1300-01 (9th Cir. 2004) (upholding the constitutionality of mandatory detention during the 90-day removal period).

Section 1231(a)(1)(B) defines when the 90-day removal period begins.  8 U.S.C. § 1231(a)(1)(B).

Section 1231(a)(1)(C) provides that "the removal period may be extended if the [noncitizen] fails to make a timely application for travel documents or acts to

---

[6] This Order does not address noncitizens subject to mandatory detention under 8 U.S.C. §§ 1226(c), 1225.  Respondents do not claim that Petitioner is subject to either of those provisions.

prevent his removal." Johnson v. Guzman Chavez, 594 U.S. 523, 528 (2021) ("Guzman Chavez").

            b.      Detention During the Post-Removal Period.

Section 1231(a)(3) states, "If the [noncitizen] does not leave or is not removed within the removal period, the [noncitizen], pending removal, *shall be subject to supervision* under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3) (emphasis added). "As mandated by Congress, the default status after the 90-day removal period is therefore release on conditions, not detention." Alva v. Kaiser, No. 25-cv-06676-RFL, 2025 WL 2419262, at *3 (N.D. Cal. Aug. 21, 2025).

However, § 1231(a)(6) authorizes the government to detain some noncitizens after the removal period. "Continued detention under this provision creates the 'post-removal period.'" Guzman Chavez, 594 U.S. at 529. In this post-removal period, "the Government 'may' detain only four categories of people: (1) those who are 'inadmissible' on certain specified grounds; (2) those who are 'removable' on certain specified grounds; (3) those it determines 'to be a risk to the community'; and (4) those it determines to be 'unlikely to comply with the order of removal.'" Johnson v. Arteaga-Martinez, 596 U.S. 573, 578-79 (2022) ("Arteaga-Martinez") (quoting 8 U.S.C. § 1231(a)(6)); see also Guzman Chavez, 594 U.S. at 528-29. Section 1231(a)(6) states that noncitizens falling into one of these categories "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3)." 8 U.S.C. § 1231(a)(6).

            c.      Case Law.

Some district courts have held that, if a noncitizen was not detained during the removal period, then § 1231(a)(6) does not authorize the government to detain them for the first time during the post-removal period. The Petition in this case relies on Diallo v. Joyce, 817 F. Supp. 3d 202 (S.D.N.Y. 2025), where the district court reasoned as follows:

Section 1231(a)(6) provides for a period of *continued* detention for certain classes of people who have not been removed at the conclusion of the ninety-day removal period.  It isn't a free-roaming right to arrest and detain people any time [the government] sees fit, even a decade after the fact.  That's clear from the text of section 1231, which defines the ninety-day removal period, see id. § 1231(a)(1)–(2), and then says that for individuals in Diallo's situation, they "may be detained *beyond* the removal period," id. § (a)(6) (emphasis added), indicating that a detention during the removal period may be extended "beyond" that period.  This understanding reflects the longstanding view of the Supreme Court, the United States, and immigration authorities themselves about how section 1231(a)(6) works.  See, e.g., Zadvydas v. Davis, 533 U.S. 678, 683 (2001) ("After entry of a final removal order and during the 90-day removal period, however, aliens must be held in custody. § 1231(a)(2).  Subsequently, as the post-removal-period statute provides, the Government 'may' *continue to detain* an alien who remains here or release that alien under supervision.  § 1231(a)(6)." (emphasis added)); Brief for Petitioners at 21, *Ashcroft v. Ma*, 533 U.S. 678 (2001) (No. 00-38), 2000 WL 1784982, at *21 ("The plain language of Section 1231(a)(6) thus vests the Attorney General with the authority to *continue an alien in detention* beyond the removal period ...." (emphasis added)); Continued Detention of Aliens Subject to Final Orders of Removal, 66 Fed. Reg. 56967-01, 2001 WL 1408247 (Nov. 14, 2001) ("After expiration of the removal period, section [1231(a)(6)] of the Act grants authority to the Attorney General to *continue the detention* of ... [a]ny inadmissible alien ...." (emphasis added)).

Further textual evidence supports this reading.  Section 1231(a)(6) says that a person "may be detained beyond the removal period *and, if released*, shall be subject to the terms of supervision in paragraph (3)."  (Emphasis added.)  The "and, if released" language reflects that section 1231(a)(6) applies to people who are already in detention, as they would be during the 90-day removal period.  Nothing in this provision suggests the arrest and detention of people anew, long after the removal period has concluded.  And such a reading would lead to anomalies.  The conditions of supervision, including re-detention, of people released under section 1231 is governed by a different part of the statute, subsection (a)(3), which provides that "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General."  See § 1231(a)(6) (confirming that "if released, [the alien] shall be subject to the terms of supervision in paragraph (3)").  But on the government's reading, anyone matching the categories in [§] 1231(a)(6)—which broadly applies to, among others, anyone inadmissible under section 1182—can be arrested and detained at any time, for any reason or no reason at all, regardless of any terms of supervision or regulations prescribed by the Attorney General.  This would override section 1231(a)(3) for vast numbers of people within that provision's scope.  Nothing in section 1231 suggests this result.

The relevant regulations also support Diallo's reading of section 1231(a)(6).  8 C.F.R. § 241.4—which by its text purports to operationalize section 1231(a)(6)—is titled "*Continued* detention of inadmissible, criminal, or other aliens beyond the removal period," (emphasis added), and repeatedly refers in its text to the decision to "continue an alien in custody."  8 C.F.R. § 241.4(a).  Further, the

regulations are replete with evidence that the period for detention under section 1231(a)(6) runs from the end of the ninety-day removal period, including, for example, the requirement that "[p]rior to the expiration of the removal period," a custody review be conducted and the person be informed whether they will be "continued in detention," so that they may challenge that determination.  8 C.F.R. § 241.4(k)(i); see also § 241.4(f) (outlining the "factors that should be weighed in considering whether to recommend *further* detention or release" (emphasis added)); [§] 241.4(h)(4) (requiring a "district director" conducting a custody review to "notify the alien in writing that he or she is to be released from custody, or that he or she will be *continued* in detention" (emphasis added)); § 241.4(i) (governing decisions by an Executive Associate Commissioner to "release or *retain* custody" (emphasis added)); cf. Loper Bright Enters. v. Raimondo, 603 U.S. 369, 374 (2024) ("An agency's interpretation of a statute 'cannot bind a court,' but may be especially informative 'to the extent it rests on factual premises within [the agency's] expertise.' ") (quoting Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 98 n.8 (1983)).

. . .

This isn't an issue of mere timing.  Rather, it's a question of what arrest and detention authority Congress provided to the Executive Branch in section 1231.  As addressed above, the statute provides for a limited, ninety-day period of mandatory detention authority, and it is clear about when that period begins and ends.  Section 1231 then provides for a period of discretionary continued detention following that period for certain classes of people, to the extent necessary to facilitate their removal.  Otherwise,

11

it provides that those subject to final orders of removal, but who aren't removed, will be released on supervision, and that the terms of their supervision and re-detention will be governed by regulation.

What it doesn't do is authorize a right to arrest and detain people at any time, for any or no reason.

Diallo, 817 F. Supp. 3d at 205-07 (footnote and parallel citations omitted); see also Mucaj v. Warden, No. 26-cv-2467, 2026 WL 1847379, at *3 (E.D. Cal. June 26, 2026) ("[Section] 1231(a)(6) allows for the continued detention, not re-detention, of certain noncitizens after the 90-day removal period…. That § 1231(a)(6) applies to continued detention and not re-detention is clear by the terms of its own text, wider statutory scheme, and relevant regulations."); Judith S.F.Z. v. Warden of the Cal. City Corr. Ctr., No. 26-cv-02966, 2026 WL 1802129, at *3 (E.D. Cal. June 22, 2026) ("[O]nce the 90-day removal period expires, if a non-citizen is not in custody, they are subject to supervision under § 1231(a)(3), not detention [under § 1231(a)(6)]."); Parra v. Favro, No. 26-cv-00363, 2026 WL 1030870, at *4 (N.D.N.Y. Apr. 16, 2026) ("The Court finds that Section 1231(a)(6) does not provide Respondents the authority to detain Petitioner years after the In Absentia Order became final.  Other courts have reached the same conclusion.").

### 2.    Parties' Arguments.

Petitioner argues that his removal order "became judicially final more than five years ago, and the ninety-day [removal] period has long since lapsed."  (Pet. at 7 ¶ 19.)  He argues that because he "was never detained during the 90-day removal period," there is "no statutory basis to detain" him now; he argues that the statute "does not allow the arrest and detention of people anew, long after the removal period has concluded."  (Pet. at 7 ¶¶ 21-22 (citing Diallo); Reply at 3 ("Petitioner has never been subject to an [OSUP], and, thus, his current detention lacks any statutory basis.").)

Respondents argue that "the government may continue to detain"

12

noncitizens "beyond this 90-day 'removal period'" under 8 U.S.C. § 1231(a)(6). (Answer at 3.)  They argue that, because Petitioner "has never previously been detained, … his detention falls squarely within the presumptively reasonable period recognized by the Supreme Court in Zadvydas [v. Davis, 522 U.S. 678 (2001)], given that he has only been in custody for 21 days." (Answer at 2.)  They argue, "[H]is removal order remains fully enforceable and unstayed – serving as the foundation for his current detention for ICE to effectuate his removal." (Id. at 2.)

### 3.    Analysis.

Respondents' Answer does not directly address the Diallo case, which is cited in the Petition, and appears to assume that the only check on the government's ability to detain noncitizens in the post-removal period is Zadvydas. Based on this lack of opposition, and the logic of the district court cases cited above, including Diallo, the Court finds that Petitioner's current detention is not authorized under § 1231(a)(6), and Petitioner should be released on an OSUP under § 1231(a)(3).[7]

### B.    Ground 2: Inadequate Medical Care at Adelanto.

#### 1.    Parties' Arguments.

Petitioner argues that, under the Fifth Amendment Due Process Clause, "The Government must provide conditions of reasonable health and safety to detainees." (Pet. at 8 ¶¶ 24-25.)  Petitioner argues Respondents violated this standard by failing

---

[7] This Order does not address a situation in which DHS diligently obtains travel documents and arrests a noncitizen in order to swiftly effectuate their removal based on those travel documents.  In the present case, although Petitioner has been detained for about a month, Respondents have not provided a description or evidence of any such efforts or any estimate of when his removal might occur. They also have not provided any explanation of what prompted Petitioner's arrest, simply stating that he is detained "for purposes of enforcing his Final Removal Order."  (Answer at 3.)

13

to give him the high blood pressure medication supplied by his wife, causing him to be hospitalized for several days.  (Pet. at 9 ¶ 27.)  Respondents' Answer fails to respond to this claim.

### 2.    Analysis.

It is not clear whether the Court has habeas jurisdiction over this type of claim, and neither party's briefing addresses that issue.  See generally Pinson v. Carvajal, 69 F.4th 1075 (9th Cir. 2023) (holding Eighth Amendment conditions-of-confinement claims brought by federal prisoners could not be raised in habeas action under 28 U.S.C. § 2241); Tavurov v. Noem, 819 F. Supp. 3d 1209 (W.D. Wash. 2026) (discussing whether Pinson applies to Fifth Amendment conditions-of-confinement claims brought by civil immigration detainees).  Even if the Court did have jurisdiction over this claim, the most relief it could order in a habeas setting is release from custody; damages would need to be sought in a civil rights action.  Because the Court is granting relief on Ground 1 and ordering Petitioner's release from custody, Ground 2 will be dismissed without prejudice as moot.

//
//
//
//
//
//
//
//
//
//
//
//
//

14

## V.   CONCLUSION

IT IS THEREFORE ORDERED that:

1. Ground 1 of the Petition is granted, and Ground 2 of the Petition is dismissed without prejudice as moot.

2. Respondents shall **immediately release** Eduard Safaryan (A# 075-726-744) from custody on an order of supervision.

3. If Respondents have not released Petitioner **within three days** of the date of this order, Petitioner may file a request for an order to show cause re contempt.[8]

DATED:  July 8, 2026

_____
KAREN E. SCOTT
UNITED STATES MAGISTRATE JUDGE

---

[8] To the extent Petitioner seeks attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), Petitioner's counsel would need to file a post-judgment motion that complies with 28 U.S.C. § 2412(d)(1)(B).

15